IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

DIANNA HELTON                                                                    PLAINTIFF

VS.                                      NO. 3:08CV00054

SOUTHLAND RACING CORPORATION                                    DEFENDANT

### ORDER

Pending is Defendant's motion for summary judgment. (Docket # 12). Plaintiff has filed a response and Defendant has filed a reply. For the reasons set forth herein, the motion for summary judgment is granted. Defendant's motion for protective order is denied as moot. (Docket # 19).

#### Facts

Plaintiff, Dianna Helton,("Helton"), who is white, claims in her complaint that she was subjected to actionable harassment while employed at Southland Racing Corporation ("Southland"). She also claims that she was retaliated against for complaining of racial discrimination and that she was constructively discharged effective September 5, 2007. Southland claims that Helton cannot establish an actionable harassment claim and that she unreasonably failed to pursue different procedures and avenues offered by Southland and its parent company, Delaware North Companies Gaming & Entertainment, Inc., to complain about any alleged harassment or discrimination. Southland also contends that Helton suffered no materially adverse employment action while at Southland due to any protected conduct in which she may have engaged and that she cannot overcome the high burden of establishing she was constructively discharged.

Helton was hired by Southland as a Money Room Clerk in March 2006. In October 2006, she applied for and received one of the Assistant Cage Manager positions. The "Cage" is the bank for Southland where customers can purchase or cash-in chips. Helton and Barbara VanLaan were hired at the same time as Assistant Cage Managers. The Cage Manager at the time was Lynn Dabbs, who in turn reported to Southland Controller, Maurice Cummings. Cummings subsequently resigned, and in late March 2007, Melissa Partee, who is African-American, was hired by Southland as his replacement. Helton complains that at the time Partee was brought into Southland, her personnel file reflected that she had created a "hostile work environment" and made inappropriate comments at her previous job.

At the end of April 2007, Cage Manager Dabbs resigned. Although her "official" reason for resigning was her health (lupus), she allegedly told Helton that she did not want to be set up to be fired by Partee. Helton contends that Dabbs advised Barry Baldwin, President of Southland, that Melissa Partee was the real reason for her resignation. According to Helton, Dabbs relayed that Partee had treated the Drop Team so poorly that members of the Drop Team were taking leave. The Drop Team, which was responsible for pulling money out of the machines at Southland, was entirely African-American. Dabbs was concerned that Partee would convince Michael Corbin, the Vice President of Finance at Delaware North, that the Drop Team problems were Dabbs' fault. Helton was surprised that Dabbs (who only worked at Southland for six months) resigned.

At the time of Dabbs' April 2007 resignation, there were three Assistant Cage Managers, Helton, Barbara VanLaan and Darlene Dumas. Helton and VanLaan are white, Dumas is African-American. Dumas was hired as a cashier in October 2006, before Partee was hired as Controller. Dumas was promoted to banker in November 2006 and to Assistant Cage Manager

in December 2006.

After Dabbs departure, Partee asked Helton to serve as Interim Cage Manager pending a formal search for a replacement. Helton, who was surprised that Partee selected her, agreed. Soon after becoming Interim Cage Manager, Helton complained to Corbin about Partee micro-managing the Cage personnel, not allowing them to do their jobs, and continually scrutinizing and criticizing their work. Corbin had given Helton a "direct order" to call him if "any issues came up with the cage." Corbin told her he was already planning a trip to Southland to speak with Partee about her "behavior." He told her he would not tell Partee about their conversations. Corbin visited Southland and checked in on Helton about two weeks after his visit. At that time, Helton reported that things were "much better." Helton testified that by mid-June Partee was again scrutinizing things in the Cage. Helton did not complain to Corbin about this behavior.

Helton believed that Partee found out about her call to Corbin and alleges that Partee began retaliating against her through condescending emails and a couple of rude or condescending conversations. Helton testified that she received condescending emails from Partee "maybe once a week." These emails may have gone to others in the Cage. Helton does not know to whom the emails were sent. Helton recalled an email in which Partee publicly scolded her. Partee was upset that Helton (at the time, the Interim Cage Manager) did not gather the information Partee requested from the Assistant Cage Managers, VanLaan and Dumas before responding to the email. Helton claims she responded as requested in the email and that both VanLaan and Dumas responded to the same email but were not publicly scolded. Helton recalled one other email received in late July in which Partee corrected her on something petty. Shondail Beech, a white female, hired to fill the Cage Manager position in late July 2007 and Helton's immediate supervisor allegedly responded to Helton after she complained as follows:

"oh, it's just Melissa. Don't worry about it." Helton could not recall any other condescending or hateful emails.

Although most of Helton's personal conversations with Partee were fine, Helton recalled two conversations that she considered offensive. Partee accused Helton (while Helton was the Interim Cage Manager) of spreading a rumor that Partee was the reason for members of the Drop Team quitting or taking leave. On another occasion, during a July 2007 meeting in which Troy Keeping asked everyone to describe their personalities, Partee described Helton as a "peacock." Helton took this to mean she was showy. Helton also recalled Partee telling her that certain people's heads were on the chopping block, including VanLaan, Director of Security Mike McFerrin, Paul Smith and Tina Thurmond, all of whom are white. Helton concedes that VanLaan and Thurman were not fired, McFerrin did not report to Partee and the issue with Smith was "a personality conflict." Helton did not recall any other conversations that she had with Partee where a hateful or condescending comment was directed at Helton. Partee never made a racist statement in Helton's presence although Helton claims that she was aware of racially charged statements made outside of her presence.

Partee did not threaten Helton's job but Helton believed that Partee was setting her up to be fired. Partee never physically threatened Helton. Helton testified that she was aware of the procedure for reporting harassment and was specifically aware of the "hotline" number found in the Code of Conduct for harassment and discrimination complaints. But, Helton claimed that the handbook also gave an option to report to an immediate supervisor and that the hotline numbers were taken down after a town hall meeting. Helton acknowledged receipt of the Southland and Delaware North's handbooks and policies on harassment. Helton testified that she had no reason to call the "hotline" prior to the end of June other than when she spoke to Mike Corbin.

In late June, Helton attended one of the new General Manager, Troy Keeping's, town hall meetings. Helton testified that she did not recall a lot about the meeting because she had just finished the overnight shift. Her general recollection was that it was a good meeting. She recalled Keeping telling the staff, "you've got to stop going over people's head." She was told that corporate was getting a lot of complaints that were petty that needed to be controlled at the management level. Helton contends that during this meeting Keeping gave a direct order to follow the chain of command in reporting complaints which meant she was to report to her supervisor and not talk to Corporate. Helton felt obligated to take any complaints to her supervisor. She testified that they were told "do not call corporate under any circumstances." After this meeting, the hotline numbers disappeared. Helton testified that Keeping may have said that any unresolved issues could be taken to Human Resources. Helton did not call the hotline before or after the town hall and management meetings in late June 2007 nor did she complain to anyone in Human Resources. Helton testified that she did not complain because she loved what she did and did not want to jeopardize her job.

Southland posted the Cage Manager position on May 1, 2007. Helton applied for the position. If Helton had received the Cage Manager position, her salary would have increased $15,000 to $37,000 per year. Helton knew that at least one other person, a friend of Partee's, applied for the position. Neither, Helton nor Partee's friend got the job. Helton claims that Partee attempted to "put up" an African-American friend, without experience, and also attempted to get Darlene Dumas, a black female, to seek the position. Shondail Beech, a white female, was named Cage Manager by Partee in July, 2007. Helton contends that Southland hired Beech even though the policy is to post the position for 10 days and Shondail had not timely applied. Helton also claims that Partee told her to hire an African-American female Gloria Masters for the cage

which Helton declined to do as Masters would not work on Sundays.  Helton was disappointed that she did not receive the job and claims that she did not receive the job because Partee was retaliating against her for the phone call to Mike Corbin in May 2007.  Southland claims that at some point prior to Beech coming to work at Southland, Helton made a comment to Partee, that she would not work with anyone if she did not get the Cage Manager position.  Helton claims the comment was misconstrued and what she said was "if we hire somebody with no experience, we're going to have a problem."  Helton apologized to Partee for the comment.

After Beech was hired, Keeping took the time to discuss with Helton why she did not receive the Cage Manager position.   Keeping told Helton that she was "very close" but that she did not have the gaming experience Southland was looking for in a permanent Cage Manager. Keeping told Helton that he had instructed Beech to take her "under her wing" and train her in preparation for the day when the Cage Manager position came open again.  Helton's impression was that she would receive the position if Beech ever left.  Helton did not complain to Keeping about Partee.  Helton claims that after she complained to Mike Corbin she complained to Beech about Partee.  Helton claims to have told Beech that Partee's actions were racially motivated, that Partee hates white people and favors black people and that Partee had listened in to her complaint to Corbin and retaliated.

Helton also complains that Southland had a policy of replacing white managers with African-American managers.  Helton claims that Southland did this because they had promised local officials and other persons who helped Southland pass an election proposal allowing games of chance that Southland would increase the pre-election ratio of African-American managers.

In the past, VanLaan had worked the day shift at Southland, Helton had worked the night shift and Dumas had filled in for VanLaan and Helton on their days off.  In April, when Lynn

Dabbs was still Cage Manager, Helton asked about working some day shifts.  Although nothing was put in writing, Dabbs told her that she would work with Helton to give Helton some day shifts.  Dabbs resigned at the end of April, 2007.

During a meeting in late July with Partee and Beech, Helton again brought up her desire to work days.  Partee responded that the schedules would not change.  Helton went to Kandis Rogers the interim Human Resources Director, but when asked if her complaint was an "HR issue," Helton said "no . . . I've got to follow the chain of command."  Helton wanted to meet with Beech.  Beech told Helton that she was unaware of the agreement with Dabbs but would do something about it.  By mid-August Helton was receiving the two day shifts per week that she had requested.  Helton raised the scheduling issue in her EEOC charge.

Southland claims that all of the Assistant Cage managers complained to Beech that Partee was harsh and unfair.  Helton claims that white employees were treated much worse.  Helton testified that she had no specific complaints about Partee between mid-August and the end of August.

Given the nature of its business, Southland directed a lot of resources to the proper handling of money.  Cash shortages or variances, occurred from time to time, although variances over $250.00 were rare.  No variance was considered insignificant, and any variance over $250.00 resulted in an automatic suspension for the teller pending investigation.  On August 28, 2007, Teller Shakedia Pace's cash drawer was short by $500.00.  Helton was the Assistant Cage Manager on duty at the time and had accessed Pace's drawer to remove a pack of gum.  Helton admitted it was rare for her to access someone else's cash drawer.  An investigation took place, and Pace informed Beech that Helton had been in her cash drawer.  Helton claims that she told Partee about the gum incident prior to Pace telling Beech.  Partee then indicated that she was

unaware of it and that Helton didn't disclose it.  Helton also informed Beech about the incident. Later in the week, Beech, Partee and Helton discussed the shortage and the gum issue.  This led Beech to ask the Security Department to review the video of the cash drawer.  After reviewing the video, Helton was cleared of any responsibility for the cash shortage.  According to Helton, the only conversation she had with Partee about the variance was an August 28 or 29 meeting with Partee and Beech.  Helton testified that the meeting was a "good meeting," even one of their best meetings ever.  Partee told Helton to be a little bit more cautious next time and that if it happened again, she would get a write-up.  Helton did not receive a discipline for opening Pace's cash drawer.  Pace (who is African-American) was terminated for the variance.

     As Helton walked in the door at Southland the morning of September 5, 2007, she had no intention of resigning.  Helton was not facing any type of discipline, pay cut, or demotion over the variance in Pace's cash drawer.  A conversation with her sister around noon changed her intentions.  Within two hours, Helton had called her husband, typed her resignation letter and tracked down Wes Culler, Human Resources Manager to hand deliver the letter.  According to Helton, Mike McFerrin (the Head of Security) told Ronnie Marconi who told a "person named Lorraine" in Human Resources, who told Helton's sister, who then told Helton that Partee had mentioned Helton as a possible suspect in a meeting the previous night (September 4) in which the variance was discussed.  Helton testified that she thought Partee was lying in a meeting to Troy and she might set her up for some kind of theft incident. McFerrin and another security person told Helton on September 5, the day she resigned, that she had been cleared, this did not change her decision to quit.  Helton was not concerned about being implicated for Pace's cash shortage; she was worried about being set-up for termination at some point down the road.

     Helton did not know why the previous night's meeting was called or what else, if

anything, was discussed. Helton did not attempt to talk with Culler, Beech or anyone in Human Resources before resigning. Helton did not try to talk to Keeping even though Helton testified "Troy was never unkind to me. Troy treated me very fair." Helton did not try to follow her chain of command. Helton's resignation letter included a statement: "I feel very fortunate to have been associated with Southland Park Gaming & Racing for the past year and half. My experience and training have been invaluable, and I leave with many pleasant memories."

Helton filed her EEOC charge on January 28, 2008. The EEOC dismissed the charge on January 22, 2008.

## Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to

> demonstrate, *i.e.*, '[to] point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988) (citations omitted)(brackets in original)). Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

## Discussion

To establish a prima facie case of a hostile work environment, a plaintiff must show: 1) that she was a member of a protected group; 2) the occurrence of unwelcome harassment; 3) a causal nexus between the harassment and her membership in a protected group; 4) that the harassment affected a term, condition, or privilege of employment; and 5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir.2007).

Claims of hostile work environment require a high evidentiary showing that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). *See also, Al-Zubaidy v. TEK Indust., Inc.*, 406 F.3d 1030, 1039 (8th Cir.2005) (holding that lower courts must apply "demanding harassment standards" when considering hostile work

environment claims); *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1078 (8th Cir.2006) (holding "Title VII's purpose is not to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight").

To determine whether an environment is sufficiently hostile or abusive the Court looks at factors including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Elmahdi v. Marriott Hotel Servs., Inc.,* 339 F.3d 645, 653 (8th Cir.2003); *Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 934 (8th Cir.2002). However, Title VII does not impose "a code of workplace civility." *Woodland v. Joseph T. Ryerson & Son, Inc*., 302 F.3d 839, 843 (8th Cir. 2002).  "More than a few isolated incidents are required," and the harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir.1999).

After a thorough review of the record, construing the evidence in the light most favorable to Helton, the Court finds that Helton has failed to allege facts that, even if assumed to be true, rise to the level of creating an abusive working environment. *See, O'Brien v. Department of Agriculture*, 532 F.3d 805 (8th Cir. 2008) ( Plaintiff must offer facts that "show the harassment to have been sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment as viewed objectively by a reasonable person."). Helton admits that no overt racial statement was ever directed to her, she was not physically threatened, her job was not threatened and she was never written up or disciplined.  Although the record does contain evidence that others heard Partee make disparaging remarks about white employees none were made in Helton's presence.  Helton's complaints of a couple of offensive comments, condescending or rude emails and that Partee questioned her involvement in a

variance do not rise to the level of actionable conduct which is severe or pervasive enough to affect a term, condition or privilege of her employment. *See Willis v. Henderson*, 262 F.3d 801, 809 (8th Cir.2001) (unpleasant conduct and rude comments do not rise to level of Title VII violation); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir.2002) (manager's posting of derogatory poster combined with boorish behavior was not "so severe and extreme that a reasonable person would find that the terms or conditions of [ ] employment had been altered."); *Scusa v. Nestle USA Co.*, 181 F.3d 958, 967 (8th Cir. 1999)(nine incidents of unpleasant conduct and offensive comments, considered "either individually or collectively," were not "severe or pervasive enough so as to alter a term, condition, or privilege of [ ] employment."); *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir.1999) (concluding that unfair criticism and being yelled at did not amount to actionable harassment).

Title VII makes it unlawful for an employer to discriminate against an employee for "oppos[ing] any practice made unlawful by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "To prove a retaliation claim, a plaintiff must show (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Gilooly v. Missouri Dept. of Health and Senior Services,* 421 F.3d 734, 739 (8th Cir. 2005). Southland argues that Helton cannot establish a prima facie case of retaliation because no adverse employment action was ever taken against her.

Helton claims that she suffered an adverse employment action because she was constructively discharged. "A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit." *Johnson v. Runyon,*

137 F.3d 1081, 1083 (8th Cir.) (internal quotations omitted), *cert. denied,*525 U.S. 916, 119 S.Ct. 264, 142 L.Ed.2d 217 (1998). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." *Summit v. S-B Power Tool,* 121 F.3d 416, 421 (8th Cir.1997) (internal quotations omitted), *cert. denied,*523 U.S. 1004, 118 S.Ct. 1185, 140 L.Ed.2d 316 (1998). The Plaintiff may prove the intent element by a demonstration that quitting was "a reasonably foreseeable consequence of the employer's discriminatory actions." *Id.* The employee must act reasonably by not assuming the worst and not jumping to conclusions too quickly. *Id.*

The Court finds that the conditions about which Plaintiff complains do not amount to sufficient evidence to support a finding of constructive discharge. Even if the working atmosphere was not ideal, "a feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *See, Breeding v. Arthur J. Gallagher and Co.,* 164 F.3d 1151, 1159 - 1160 (8th Cir. 1999). Plaintiff has presented no evidence to suggest that Southland acted with the intention of forcing her to resign or that her resignation was a reasonably foreseeable consequence of Partee's actions. *See, Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 495-97 (8th Cir. 1996)( racially discriminatory shift assignments and failure to promote did not create an objectively intolerable atmosphere that forced the plaintiff to resign; "frustration and embarrassment at not being promoted do not make work conditions sufficiently intolerable to constitute constructive discharge . . . dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.")(citations omitted).

Helton also claims that she was denied a promotion to Cage Manager in retaliation for her

complaints. A plaintiff establishes a prima facie case of discrimination in a failure-to-promote case by showing that: (1) she is a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead. *See, Gentry v. Georgia-Pacific* Corp. 250 F.3d 646, 650 (8th Cir. 2001)

Southland argues that Helton cannot demonstrate the elements of her claim. Helton failed to offer sufficient evidence that she was more qualified for the position than the individual hired, Ms. Shondail Beech. Ms. Beech had over fifteen years of experience in the gaming industry at the time she was hired by Southland and Helton had less than one year experience.

Helton argues that a genuine issue of fact exists as to whether she was qualified for the position. However, Helton's conclusory allegations of discrimination are insufficient to create a genuine issue of material fact to avoid summary judgment. *Thomas v. Corwin*, 483 F.3d 516 (8th Cir. 2007). Plaintiff has made no showing that intentional discrimination played any role in the determination that Ms. Beech was more qualified for this position. "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765 (8th Cir. 2008) citing, *Johnson v. Ready Mixed Concrete Co.,* 424 F.3d 806, 812 (8th Cir.2005) (quoting *Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 973 (8th Cir.1994)).

Wherefore, the Court finds that Defendant's motion for summary judgment should be, and hereby is, GRANTED. Defendant's motion for protective order is DENIED AS MOOT. (Docket # 19).

IT IS SO ORDERED this 23rd day of February, 2009.

                    */s/ James M. Moody*
                    _____
                    James M. Moody
                    United States District Judge